IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO CELLULAR TELEPHONES FURTHER DESCRIBED IN ATTACHMENTS A-1 AND A-2, CURRENTLY LOCATED IN THE CHARLOTTE-MECKLENBURG POLICE DEPARTMENT EVIDENCE ROOM, WITHIN THE WESTERN DISTRICT OF NORTH CAROLINA | Case No. 3:20-mj-191 |

## AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE

I, Charlie Davis, being duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of Applications under Rule 41 of the

Federal Rules of Criminal Procedure for Search Warrants authorizing the

examination of property—electronic devices—which are currently in law

enforcement possession, and the extraction from that property of electronically

stored information described in Attachments B-1 and B-2.

2.      I am a Task Force Officer ("TFO") with the U.S. Bureau of Alcohol,

Tobacco, Firearms and Explosives ("ATF") and have been so assigned since

December 2014.  My duties as an ATF TFO involve investigating violations of

federal criminal laws, particularly those concerning firearms, violent crimes, and

narcotics, in the Western District of North Carolina.  Prior to working with ATF, I

served as a vice and narcotics detective for approximately eight years with the Charlotte-Mecklenburg Police Department ("CPMD").  I also served in CMPD's Street Crimes Unit for approximately two years and spent approximately three years as a patrol officer.

3.      During my law enforcement career, I have received hundreds of hours of training from local, state, and federal agencies on the investigation of criminal offenses, including training covering street drug enforcement, interdiction tactics, using informants, surveillance and intelligence gathering, undercover work, narcotics investigations, and preparing search warrant applications.  During my law enforcement career with ATF and CPMD, I have participated in numerous investigations which have resulted in arrests and seizures of currency, financial ledgers, firearms, controlled substances, and related evidence.  During the course of these investigations, I have conducted or participated in physical and electronic surveillance, and I have conducted numerous debriefings of informants, cooperating defendants, and other individuals cooperating with the United States.  I have executed or assisted in executing numerous search warrants resulting in the seizure of firearms, narcotics, narcotics records, and financial documents.  I earned a Bachelor of Science in Criminal Justice from Western Carolina University.

4.      Based on my law enforcement training and experience, I am familiar with the methods, habits, and practices of drug traffickers.  I have participated in numerous federal and state investigations involving drugs and/or firearms, including investigations involving violations of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C.

2

§§ 922(g)(1) and 924(c). My experience in this area includes undercover drug purchases, surveillance, searches and seizures, arrests, intelligence analysis, analysis of devices seized from drug traffickers, interviews and interrogations, drug interdiction operations, and clandestine drug laboratories. Additionally, my training and experience has familiarized me with practices drug traffickers employ to collect and launder drug trafficking proceeds, including methods drug traffickers use to disguise the source and nature of their drug trafficking profits.

5. For the purpose of supporting these Applications for Search Warrants, I have set forth herein facts that I believe are sufficient to establish probable cause to believe that evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. §§ 922(g)(1) and 924(c) is located in the following devices seized following a high-speed chase on June 26, 2020: (1) a black LG cellular telephone in a black case, further described in Attachment A-1 ("**TARGET CELL PHONE #1**"); and (2) a black and silver iPhone in a black and gold case, further described in Attachment A-2 ("**TARGET CELL PHONE #2**") (collectively, the "**TARGET CELL PHONES**"). The **TARGET CELL PHONES** are further described in Attachments A-1 and A-2. The **TARGET CELL PHONES** are currently secured in the Charlotte-Mecklenburg Police Department evidence room, located in the Western District of North Carolina. The applied-for Warrants would authorize the forensic examination of the **TARGET CELL PHONES** for the purpose of identifying electronically stored data particularly described in Attachments B-1 and B-2.

3

6.      The information in this Affidavit is based upon my background and experience, my personal observations and knowledge of this investigation, and information provided to me by other law enforcement officers.  Because of the limited purpose of this Affidavit, I have not included each and every fact known to me regarding this investigation, but only those facts I believe necessary to establish probable cause for these Warrants.

## PROBABLE CAUSE

7.      On June 19, 2020, a federal grand jury in the Western District of North Carolina indicted Timothy Lamont Johnson ("JOHNSON") on the following charges:  (1) possessing ammunition while a felon, in violation of 18 U.S.C. § 922(g)(1); and (2) possessing a firearm and ammunition while a felon, in violation of 18 U.S.C. § 922(g)(1).  *See United States v. Timothy Lamont Johnson*, Case No. 3:20-cr-205-MOC.  The charges stem from JOHNSON shooting and severely injuring a victim in Charlotte on January 10, 2020.  The evidence that JOHNSON shot the victim is extremely strong, including the following:  (i) the victim identified JOHNSON as the shooter to several witnesses who rushed to help him immediately following the shooting, and to law enforcement investigators; (ii) when police arrested JOHNSON approximately 24 hours after the shooting, they found a loaded pistol in his car beneath his driver's seat; forensic testing has confirmed that the pistol fired the spent bullet casings recovered from the shooting; and (iii) JOHNSON admitted shooting the victim on a jail call immediately following his arrest for the shooting.

4

8.      On June 26, 2020, CMPD officers searched for JOHNSON to arrest him on the federal warrant.  They located JOHNSON in a car driven by another man, subsequently identified as Louie Ramond Forney ("FORNEY").  FORNEY was in the car's driver's seat, and JOHNSON was in the car's front passenger seat.  They were the only people in the car.  The car was a rental.[1]

9.      When CMPD officers attempted to pull the car over to arrest JOHNSON, the car fled, ramming a police car in the process.  FORNEY and JOHNSON led police on a high-speed chase.

10.      During the pursuit, officers saw the car's occupants throw a black backpack and an AR-style assault rifle out the window.  The backpack contained the following:  (i) approximately 20 grams of a white powdery substance in one bag; (ii) approximately 1.3 grams of a gray/brown substance in another bag; and (iii) an inhaler.[2]  Based on its appearance, investigators initially believed the white substance to be powder cocaine and the gray/brown substance to be heroin.  Investigators did not field-test the substances and instead sent them to a lab for analysis.[3]  The AR rifle was loaded with a 30-round magazine, with a round in the chamber.

11.      Subsequently, the fleeing car slowed down.  JOHNSON jumped out and surrendered to officers.  FORNEY continued to flee in the car.  When the

---

[1] In my training and experience, drug traffickers often use rental vehicles to conduct their drug trafficking activities.

[2] These items were on the ground around the backpack, apparently having fallen out of it.

[3] The lab has not yet completed its analysis.

officers finally apprehended FORNEY, he asked officers for his inhaler. When the officers arrested FORNEY, they seized the following cell phone from his person: a black LG cellular telephone in a black case, further described in Attachment A-1 ("**TARGET CELL PHONE #1**"). When the officers searched the car, they also found the following cell phone in the center console: a black and silver iPhone in a black and gold case, further described in Attachment A-2 ("**TARGET CELL PHONE #2**").

12.     FORNEY is currently on federal supervised release after serving a 40-month prison sentence for possessing a firearm while a convicted felon. *See United States v. Louie Ramond Forney*, Case No. 3:17-cr-270-MOC. The U.S. District Court for the Western District of North Carolina has issued a warrant for his arrest for violating his supervised release in connection with the above-described incident.

13.     In jail calls following his arrest on June 26, 2020, a man apparently speaking on FORNEY's behalf appeared to attempt to convince JOHNSON to claim the AR-style assault rifle, explaining that "if he [referring to FORNEY] gets hit . . . with drugs with a gun, he is looking at double digit years in prison."[4] The man also told JOHNSON that claiming the rifle would not increase JOHNSON's sentence on his already-existing federal felon-in-possession charges.

---

[4] On the calls, JOHNSON and the man he is speaking to do not refer to FORNEY by his name, but rather by a nickname that I know that FORNEY uses. I am familiar with this nickname because I also served as the case agent on FORNEY's original federal case.

6

14.     Similarly, in a separate jail call to a woman, believed to be his mother, JOHNSON stated that the man he was with when CMPD arrested him "threw an AK out the car, threw an ounce of heroin out the car."  And in another jail call to a man, believed to be his brother, JOHNSON stated that the man he was with when CMPD arrested him had an "AK and a half ounce of god-damn heroin."

15.     In my training and experience, 20 grams of cocaine or heroin is a distribution amount of either narcotic.

16.     In my training and experience, I know that drug traffickers regularly use multiple phones to facilitate their drug trafficking activities in order to frustrate law enforcement investigations.  Additionally,  in my training and experience, the presence of the **TARGET CELL PHONES**, combined with FORNEY's and JOHNSON's presence in a rented car, their flight from law enforcement, the seized narcotics, and the loaded rifle, strongly suggests that the **TARGET CELL PHONES** were used in connection with drug trafficking.

17.     The **TARGET CELL PHONES** are currently secured in the Charlotte-Mecklenburg Police Department evidence room, located in the Western District of North Carolina.  The **TARGET CELL PHONES** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the deputies initially seized them.

7

## CHARACTERISTICS OF DRUG TRAFFICKERS

18.     During the course of my career, I have been involved in numerous investigations involving the manufacture, possession, and distribution of controlled substances.  As such, I am familiar with methods, routines, and practices commonly followed by drug traffickers.

19.     Drug traffickers regularly possess and maintain numerous cellular telephones on their persons at all times.  Drug traffickers do this as a means to attempt to avert law enforcement detection during their drug trafficking activities.

20.     These cellular telephones often contain information concerning the locations they have traveled, constituting evidence concerning the identities of their users and their drug trafficking activities.

21.     Drug traffickers regularly maintain books, records, customer lists, contacts, receipts, notes, ledgers, and other information, for extended periods of time, relating to the transportation, ordering, sales, and distribution of controlled substances and equipment, even though such information may be in code.  Drug traffickers commonly keep such information in their cell phones where they have ready access to it.

22.     Drug traffickers frequently maintain financial records and associated information related to their distribution of controlled substances.  They also often place assets in names other than their own to avoid detection of these assets by government agencies.  Drug traffickers commonly maintain such financial information in their cell phones.

8

23.     Drug traffickers usually maintain addresses or telephone numbers that reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization, even if said items may be in code.  Drug traffickers commonly maintain such information in their cell phones.

24.     Drug traffickers' communication method of choice is the cell phone. Such cell phones often contain information related to suppliers, customers, and associates of the drug trafficker.  Drug traffickers often communicate with such persons via cell phone to arrange meetings and place orders in furtherance of their illicit activities, and the information about the communications may be saved on the cell phone in the form of text messages and call histories.  As such, drug traffickers' cell phones often contain valuable information about the specific dealings of the individual and the scope of the criminal enterprise.

25.     As a matter of pride or as sign of success, it is common for drug traffickers to use their cell phones to take photographs or videos of drugs, drug proceeds, and firearms used to protect their drugs or drug proceeds.

26.     Based upon the above-described facts and my training and experience concerning drug trafficking investigations, I believe that a search, forensic analysis, and seizure of electronic data from the **TARGET CELL PHONES** likely will provide evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. §§ 924(c) and 922(g)(1).

9

## TECHNICAL TERMS

27.     Based on my training and experience, I use the following technical

terms to convey the following meanings:

   a.  Wireless telephone:  A wireless telephone (or mobile telephone, or
       cellular telephone) is a handheld wireless device used for voice and data
       communication through radio signals.  These telephones send signals
       through networks of transmitter/receivers, enabling communication
       with other wireless telephones or traditional "land line" telephones.  A
       wireless telephone usually contains a "call log," which records the
       telephone number, date, and time of calls made to and from the phone.
       In addition to enabling voice communications, wireless telephones offer
       a broad range of capabilities.  These capabilities include: storing names
       and phone numbers in electronic "address books;" sending, receiving,
       and storing text messages and e-mail; taking, sending, receiving, and
       storing still photographs and moving video; storing and playing back
       audio files; storing dates, appointments, and other information on
       personal calendars; and accessing and downloading information from
       the Internet.  Wireless telephones may also include global positioning
       system ("GPS") technology for determining the location of the device.

   b.  Digital camera:  A digital camera is a camera that records pictures as
       digital picture files, rather than by using photographic film.  Digital
       cameras use a variety of fixed and removable storage media to store
       their recorded images.  Images can usually be retrieved by connecting
       the camera to a computer or by connecting the removable storage
       medium to a separate reader.  Removable storage media include various
       types of flash memory cards or miniature hard drives.  Most digital
       cameras also include a screen for viewing the stored images.  This
       storage media can contain any digital data, including data unrelated to
       photographs or videos.

   c.  Portable media player:  A portable media player (or "MP3 Player" or
       iPod) is a handheld digital storage device designed primarily to store
       and play audio, video, or photographic files.  However, a portable
       media player can also store other digital data.  Some portable media
       players can use removable storage media.  Removable storage media
       include various types of flash memory cards or miniature hard drives.
       This removable storage media can also store any digital data.
       Depending on the model, a portable media player may have the ability

to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude, with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

11

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28.     Based on my training, experience, and research, I know that the

**TARGET CELL PHONES** have capabilities that allow them to serve as wireless

telephones, digital cameras, portable media players, GPS navigation devices, PDAs,

and/or tablets. In my training and experience, examining data stored on devices of

this type can uncover, among other things, evidence that reveals or suggests who

possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.     Based on my knowledge, training, and experience, I know that

electronic devices can store information for long periods of time. Similarly, things

that have been viewed via the Internet are typically stored for some period of time on

the device. This information can sometimes be recovered with forensics tools.

30.     *Forensic evidence.* As further described in Attachments B-1 and B-2,

these Applications seek permission to locate not only electronically stored

12

information that might serve as direct evidence of the crimes described on the

Warrants, but also forensic evidence that establishes how the **TARGET CELL**

**PHONES** were used, the purpose of their use, who used them, where they were

used, and when. There is probable cause to believe that this forensic electronic

evidence might be on the **TARGET CELL PHONES** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the electronic device was used, the purpose of its use, who used it, where it was used, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the Warrants.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, where, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

    31.   *Nature of examination.* Based on the foregoing, and consistent with Rule

41(e)(2)(B), the Warrants I am applying for would permit the examination of the

13

**TARGET CELL PHONES** consistent with the Warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the Warrants. Sometimes the standard way of retrieving forensic evidence from cellular telephones will not work. Accordingly, I request approval to use sophisticated methods such as, but not limited to, JTAG, Rooting, Chip Off, or any other methods which will extract data from the **TARGET CELL PHONES**. Some of these sophisticated methods may render the **TARGET CELL PHONES** unusable. Further, if needed, I also request the authority to send any of the **TARGET CELL PHONES** out of the district to forensic and or cryptologic specialists for examination, unlocking and de-crypting of the devices.

32.     *Manner of execution.* Because these Warrants seek only permission to examine devices already in law enforcement possession, the execution of these Warrants does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the Warrants at any time in the day or night.

14

## CONCLUSION

33.      I submit that this Affidavit supports probable cause for Search Warrants

authorizing the examination of the **TARGET CELL PHONES** described in

Attachments A-1 and A-2, to seek the items described in Attachments B-1 and B-2.

Respectfully,

*/s/ Charlie Davis*
Charlie Davis
Task Force Officer, ATF

**Affidavit Reviewed by Assistant United States Attorney Taylor G. Stout**

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents
of this Affidavit, which was submitted to me by reliable electronic means, on this
13th day of July, 2020, at 5:28 PM

Signed: July 13, 2020

David C. Keesler
United States Magistrate Judge

15

**ATTACHMENT A-1**

The property to be searched is a black LG cellular telephone in a black case, further described in Attachment A-1 ("**TARGET CELL PHONE #1**"). **TARGET CELL PHONE #1** is currently located in the Charlotte-Mecklenburg Police Department evidence room, in the Western District of North Carolina. Below are photographs of **TARGET CELL PHONE #1**.

This Warrant authorizes the forensic examination of **TARGET CELL PHONE #1** for the purpose of identifying the electronically stored information described in Attachment B-1.

 

## **ATTACHMENT B-1**

1.        All records on **TARGET CELL PHONE #1** described in Attachment

A-1 that relate to violations of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. §§

922(g)(1) and 924(c) involving FORNEY, JOHNSON, and/or their co-conspirators,

including:

   a.  All photographs, digital images, and videos;

   b.  All information pertaining to incoming or outgoing telephone calls, text
       messages, or other communications;

   c.  All information pertaining to contacts, date books, calendars,
       appointments, or other scheduling records or addresses;

   d.  All information pertaining to stored and/or un-retrieved telephone
       numbers, voice messages, text messages, memorandums, writings,
       emails, or other communications;

   e.  Lists of drug customers and potential customers and related identifying
       information;

   f.  Types, amounts, and prices of drugs trafficked as well as dates, places,
       and amounts of specific drug transactions;

   g.  Any information related to sources of drugs (including names,
       addresses, phone numbers, or any other identifying information);

   h.  Drug ledgers;

   i.  Any information recording the user's schedule, location, or travel;

> j. All bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned **TARGET CELL PHONE #1** at the time the things described in this Warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet relating to drug trafficking activity, including:

> a. records of Internet Protocol addresses used;

> b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2

<h1 style="text-align: center;"><strong><u>ATTACHMENT A-2</u></strong></h1>

The property to be searched is a black and silver iPhone in a black and gold case, further described in Attachment A-2 ("**TARGET CELL PHONE #2**") ("**TARGET CELL PHONE #2**").  **TARGET CELL PHONE #2** is currently located in the Charlotte-Mecklenburg Police Department evidence room, in the Western District of North Carolina.  Below are photographs of **TARGET CELL PHONE #2**.

This warrant authorizes the forensic examination of **TARGET CELL PHONE #2** for the purpose of identifying the electronically stored information described in Attachment B-2.




## **ATTACHMENT B-2**

1.      All records on **TARGET CELL PHONE #2** described in Attachment A-2 that relate to violations of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. §§ 922(g)(1) and 924(c) involving FORNEY, JOHNSON, and/or their co-conspirators, including:

   a. All photographs, digital images, and videos;

   b. All information pertaining to incoming or outgoing telephone calls, text messages, or other communications;

   c. All information pertaining to contacts, date books, calendars, appointments, or other scheduling records or addresses;

   d. All information pertaining to stored and/or un-retrieved telephone numbers, voice messages, text messages, memorandums, writings, emails, or other communications;

   e. Lists of drug customers and potential customers and related identifying information;

   f. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific drug transactions;

   g. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   h. Drug ledgers;

   i. Any information recording the user's schedule, location, or travel;

j.  All bank records, checks, credit card bills, account information, and other financial records.

2.  Evidence of user attribution showing who used or owned **TARGET CELL PHONE #2** at the time the things described in this Warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.  Records evidencing the use of the Internet relating to drug trafficking activity, including:

a.  records of Internet Protocol addresses used;

b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2